## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WILLIAM H. SCOTT, | : | CIVIL NO: 1:14-CV-00535 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | (Magistrate Judge Schwab) |
| | : | |
| TRAVELERS COMMERCIAL INS. | : | |
| CO., | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM
October 6, 2016

### I.    Introduction.

This case compels us to address the interplay between precise terms in an insurance policy, which require the insured's submission to medical examinations as often as the insurer reasonably requires, and a specific provision of Pennsylvania's Motor Vehicle Financial Responsibility Law ("MVFRL"), 75 PA. CONS. STAT. ANN. § 1701, *et seq*., which requires an insurer to petition the state court with a showing of good cause to obtain an order compelling the insured to undergo such examinations.  This issue is one that has yet to be resolved by the Supreme Court of Pennsylvania and is inconsistently being played out in the lower courts across the Commonwealth.  For the reasons set forth below, we predict that the Supreme Court of Pennsylvania would find that the MVFRL's provision

prevails over the conflicting terms in the parties' policy.  Given our prediction, the plaintiff, William H. Scott ("Scott"), is entitled to judgment as a matter of law with respect to liability on his breach of contract claim.  He is not, however, entitled to judgment as a matter of law with respect to his statutory bad faith claim because he is barred by the applicable statute of limitations.

## II.    Background.

On February 18, 2014, Scott filed a complaint (*doc. 1* at 11-21) in the Court of Common Pleas of Dauphin County, Pennsylvania against Travelers Commercial Insurance Company ("Travelers"), raising a statutory bad faith claim and a breach of contract claim.  *Id.* at 16, 18.  On March 21, 2014, Travelers—properly, The Standard Fire Insurance Company ("Standard")[1]—filed a notice of removal from the Court of Common Pleas to the U.S. District Court for the Middle District of Pennsylvania.  In its notice of removal, Standard alleged that Scott is a citizen of the Commonwealth of Pennsylvania; Standard is a corporation organized and existing under the laws of Connecticut, with its principal place of business in Hartford, Connecticut; and the amount in controversy exceeds $75,000.  *Id.* at 3.

---

[1] In the notice of Removal (*doc. 1* at 3), as well as in the Answer (*doc. 3* at 2), Standard asserts that it has been erroneously named as Travelers.  At oral argument, counsel for Travelers proffered that Standard was the insurer that issued the disputed insurance policy.  Thus, Standard is the proper name of the defendant in this matter.

Standard further alleged, and we agreed, that removal was proper pursuant to 28 U.S.C. §§ 1441 *et. seq.* on the basis of diversity jurisdiction, 28 U.S.C. § 1332.  *Id.* at 4.

Upon removal, Standard filed its answer (*doc. 3*) to the complaint, along with affirmative defenses; Scott filed his response (*doc. 4*) thereto; and both parties consented to proceed before the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) (*see docs. 6*, *7*).  After the undersigned was assigned the case, we entered an Order setting a November 1, 2014, fact discovery deadline and a March 1, 2015, dispositive motions deadline.  *Doc. 10.*  On December 23, 2014, Standard filed its motion (*doc. 17*) for summary judgment, arguing that it is entitled to judgment as a matter of law on Scott's claims of statutory bad faith and breach of contract.  And, on February 10, 2015, Scott filed a cross-motion (*doc. 26*) for summary judgment, arguing that he is entitled to judgment as matter of law on both claims.  The parties have fully briefed the motions and participated in oral argument (*see docs. 33*, *38*).  After a thorough consideration of the parties' briefing and their respective arguments, we will grant in part and deny in part both of their motions.

## III.   Statement of Facts.

Although the parties have filed cross-motions for summary judgment, the undisputed, material facts can be succinctly stated, together, as follows:

On April 8, 2009, Scott was involved in a motor vehicle accident in Dauphin County, Pennsylvania.  *See doc. 28* at ¶ 1; *doc. 30* at ¶ 1.  As a result of the accident, Scott sustained personal injuries.  *Doc. 28* at ¶ 2; *doc. 30* at ¶ 2.[2]  Scott was insured for personal automobile insurance through Standard under Policy Number 028622807 101 1 (the "Policy") with effective dates of March 15, 2009, to September 15, 2009.  *See doc. 19* at ¶ 5; *doc. 22* at ¶ 5; *doc. 17-2* at 5.  The Policy includes a provision (the "Provision") requiring Scott to "[s]ubmit, as often as" Standard "reasonably require[s]" to "physical exams by physicians [Standard] select[s]."  *Doc. 19* at ¶ 6; *doc. 22* at ¶ 6; *see doc. 17-2* at 24.  The Policy also requires Scott to cooperate with Standard "in the investigation, settlement or defense of any claim or suit."  *Doc. 19* at ¶ 7; *doc. 22* at ¶ 7; *see doc. 17-2* at 24.

After submitting a claim under the Policy for first-party medical benefits, Standard, through The Prime Network, notified Scott that he was to be scheduled for an Independent Medical Examination ("IME").  *Doc. 28* at ¶ 5; *doc. 30* at ¶ 5.

---

[2] On July 24, 2015, Scott filed medical bills (*see doc. 37*) on the docket to support the damages aspect of his breach of contract claim. Standard has neither responded to these medical bills, nor sought leave to do so.

4

In response to Standard's request, Scott, through counsel, sent correspondence to Standard, stating, in part: "If you should desire to send me three proposed names [of IME doctors], I will consider such a request in the absence of a court order." *Doc. 28* at ¶ 7; *doc. 30* at ¶ 7; *see doc. 17-2* at 67.   Despite counsel's correspondence, Standard, again through the assistance of The Prime Network, scheduled an IME for Scott on October 30, 2009.  *Doc. 28* at ¶ 8; *doc. 30* at ¶ 8. Scott, however, did not attend this IME.  *Doc. 19* at ¶ 10; *doc. 22* at ¶ 10.

On or about December 16, 2009, Standard sent Scott's counsel correspondence, citing the Policy Provision, as well as Pennsylvania case law, to support its position that Scott was required to submit to an IME.  *Doc. 19* at ¶ 11; *see doc.* 29-1.[3]  Specifically, Standard's letter provided:

> Travelers is requesting an IME for [Scott] at this time for the following reasons:
>
> Verification of current injuries, anticipated resolution and/or recommendations for treatment alternatives.
>
> Therefore, Travelers is exercising their right to request an [IME] as provided in the [P]olicy[.]

---

[3] Scott denies this statement of fact in his counterstatement of facts (*doc. 22* at ¶ 11), without citing to record evidence.  Curiously, however, Scott included this fact in his own statement of material facts (*see doc. 28* at ¶ 10), and admitted this fact when responding to Standard's requests for admission (*see doc. 17-2* at 58, 65).

*Doc. 29*-1.  Scott was then given notice that another IME was scheduled for January 29, 2010.   *Doc. 19* at ¶ 12; *doc. 22* at ¶ 12.   Through more correspondence, dated January 20, 2010, Scott's counsel responded and advised Standard that Scott would not be attending the scheduled IME.  *Doc. 19* at ¶ 13; *doc. 22* at ¶ 13.  As promised, Scott did not attend the IME.  *Doc. 19* at ¶ 14; *doc. 22* at ¶ 14.

Thereafter, Scott's counsel received correspondence, dated February 17, 2010, from Standard, which again quoted the Policy Provision and advised Scott that Standard would only pay medical bills received up to five days after the date of the correspondence due to Scott's refusal to attend the previously scheduled IMEs.  *Doc. 19* at ¶ 15; *doc. 22* at ¶ 15.

Less than one week later, Scott's counsel explained, *via* more correspondence, that it was in receipt of Standard's February 17, 2010 letter.  *See doc. 26-1* at 3.  Scott's counsel reiterated that even in the absence of a court order, Scott would have been willing to attend an IME had he been provided with a panel of three IME physicians, from which the parties mutually could choose one.  *See id.*  Despite counsel's correspondence, Standard stopped paying Scott's first-party medical benefits, *see doc.* 30 at ¶ 15, and this litigation inevitably ensued.

## IV.    Summary Judgment Standards.

Scott and Standard have filed their respective motions for summary judgment pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, which provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).   "Through summary adjudication the court may dispose of those claims that do not present a 'genuine dispute as to any material fact' and for which a jury trial would be an empty and unnecessary formality." *Goudy-Bachman v. U.S. Dept. of Health & Human Services*, 811 F. Supp. 2d 1086, 1091 (M.D. Pa. 2011) (quoting FED. R. CIV. P. 56(a)).

The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).   With respect to an issue on which the nonmoving party bears the burden of proof, the moving party may discharge that burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met its burden, the nonmoving party may not rest upon the mere allegations or denials of its pleading; rather, the nonmoving party

must show a genuine dispute by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or "showing that the materials cited do not establish the absence . . . of a genuine dispute." FED. R. CIV. P. 56(c).  If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. *Celotex*, 477 U.S. at 322.  Summary judgment is also appropriate if the nonmoving party provides merely colorable, conclusory, or speculative evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts. *Id.* at 252.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.  A dispute about a material fact is genuine only if there is a sufficient evidentiary

basis that would allow a reasonable fact finder to return a verdict for the non-moving party. *Id.* at 248-49. When "faced with a summary judgment motion, the court must view the facts 'in the light most favorable to the nonmoving party.'" *N.A.A.C.P. v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

At the summary judgment stage, the judge's function is not to weigh the evidence or to determine the truth of the matter; rather it is to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. The proper inquiry of the court "is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

Summary judgment is warranted, after adequate time for discovery, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. "Under such circumstances, 'there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.'" *Anderson v. CONRAIL*, 297 F.3d 242, 247 (3d Cir. 2002) (quoting *Celotex*, 477 U.S. at 323). "[S]ummary judgment is essentially 'put

up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006).

Further, a party that moves for summary judgment on an issue for which he bears the ultimate burden of proof faces a difficult road. *United States v. Donovan*, 661 F.3d 174, 185 (3d Cir. 2011). "[I]t is inappropriate to grant summary judgment in favor of a moving party who bears the burden of proof at trial unless a reasonable juror would be compelled to find its way on the facts needed to rule in its favor on the law." *El v. Se. Pa. Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007) (footnote omitted). A party who has the burden of proof must persuade the factfinder that his propositions of fact are true, and "if there is a chance that a reasonable factfinder would not accept a moving party's necessary propositions of fact, pre-trial judgment cannot be granted." *Id.* "Specious objections will not, of course, defeat a motion for summary judgment, but real questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof, will." *Id.*

## V. Discussion.

As mentioned, Scott raises the following two claims against Standard: (1) a statutory bad faith claim; and (2) a breach of contract claim. *Doc. 1* at 16, 18. Considering that we are sitting in diversity, we note from the outset that the substantive law of Pennsylvania applies to both of these claims. *See Chamberlain v. Giampapa*, 210 F.3d 154, 158 (3d Cir. 2000) (citing *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938)). In applying the substantive law of Pennsylvania, we further note that "the highest court of the state,"—and for our purposes, the Supreme Court of Pennsylvania—"is the final arbiter of what is state law." *West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 236 (1940) (citing *Wichita Royalty Co. v. City Nat'l Bank of Wichita Falls*, 306 U.S. 103, 107 (1939)). Thus, when the Supreme Court of Pennsylvania has spoken, "its pronouncement is to be accepted by federal courts as defining state law unless it has later given clear and persuasive indication that its pronouncement will be modified, limited, or restricted." *West*, 311 U.S. at 236. When the Supreme Court of Pennsylvania has not spoken, however, we are tasked "with predicting how [it] would resolve the question at issue." *Colliers Lanard & Axilbund v. Lloyds of London*, 458 F.3d 231, 236 (3d Cir. 2006). In so predicting, "we must take into consideration: (1) what that court has said in related areas; (2) the decisional law of the state intermediate courts; (3) federal cases interpreting

11

state law; and (4) decisions from other jurisdictions that have discussed the issue."

*Id.*

### A. Scott's Statutory Bad Faith Claim.

Count II of Scott's complaint sets forth a bad faith claim pursuant to 42 PA. CONS. STAT. ANN. § 8371.[4]   *Doc. 1* at 18.  Standard contends that this claim is barred by the statute of limitations.  *Doc. 3* at ¶ 55; *see doc. 18* at 5, 12-13.  Scott contends, however, that Standard is incorrect because a four-year, and not a two-year, statute of limitations should apply to his bad faith claim.  *Doc. 23* at 11-13. As discussed below, however, Scott's claim for bad faith is barred by the applicable two-year statute of limitations, and as such, summary judgment will be entered in favor of Standard with respect to Count II of the complaint.

---

[4] The text of that statute reads:

> In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:
>
> (1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.
>
> (2) Award punitive damages against the insurer.
>
> (3) Assess court costs and attorney fees against the insurer.

42 PA. CONS. STAT. ANN. § 8371.

A bad faith claim pursuant to 42 PA. CONS. STAT. § 8371 is subject to a two-year statute of limitations under 42 PA. CONS. STAT. ANN. § 5524. *Ash v. Continental Ins. Co.*, 932 A.2d 877, 885 (Pa. 2007).[5] "In general, the statute of limitations begins to run when a right to institute and maintain suit arises." *Sikirica v. Nationwide Ins. Co*., 416 F.3d 214, 224-25 (3d Cir. 2005). And, "[a] bad faith claim arises upon a 'frivolous or unfounded refusal to pay proceeds of [a] policy.'" *Id.* at 225 (quoting *Adamski v. Allstate Ins. Co.*, 738 A.2d 1033, 1036 (Pa. 1999)). Thus, the two-year statute of limitations period for a bad faith claim under § 8371 begins to run when the insurer first provides clear and unambiguous notice of a refusal to pay under the policy. *Id.*

Here, it is undisputed that Standard provided clear and unambiguous notice to Scott by a letter, dated February 17, 2010, that it would only pay medical bills received up to five days after the date of the letter. *Doc. 19* at ¶ 15; *doc. 22* at ¶ 15; *see doc. 17-2* at 70. Thus, the statute of limitations began to run on or about February 17, 2010, the date of Standard's letter of denial. *See doc. 27* at 23; *doc. 31* at 18 n.3. Scott, however, did not commence this action in the Dauphin County Court of Common Pleas until February 18, 2014, more than two years after

---

[5] Federal courts sitting in diversity jurisdiction "are obliged to apply state substantive law which includes statutes of limitations." *Menichini v. Grant*, 995 F.2d 1224, 1228 n.2 (3d Cir. 1993) (citing *Ciccarelli v. Carey Canadian Mines, Ltd.*, 757 F.2d 548, 552 (3d Cir. 1985)).

Standard's letter.  *See doc. 1* at 11; *see also Sikirica*, 416 F.3d at 225 (applying, in a statute of limitations analysis of a bad faith claim, the date on which plaintiff initiated the action in state court, not the date that it was removed to federal court). Accordingly, Scott's claim for bad faith is barred by the statute of limitations, and as such, summary judgment will be entered in favor of Standard with respect to this claim.  *See Sikirica*, 416 F.3d at 225 (holding that the statute of limitations for the plaintiff's statutory bad faith claim began to run on the date of the defendant's denial letter, which unambiguously informed the plaintiff that defendant would not defend, indemnify, or protect the plaintiff against the class action allegations of the complaint); *Nat'l Recovery Agency, Inc. v. AIG Domestic Claims, Inc.*, No. 05–033, 2006 WL 1289545, at *7 (M.D. Pa. May 9, 2006) (holding that the statute of limitations on a statutory bad faith claim began to run on the date the insurer provided clear notice by letter that it would neither defend nor indemnify the plaintiff in a lawsuit); *Campbell v. State Farm Mut. Auto. Ins. Co.*, 617 F.Supp.2d 378, 382–83 (W.D. Pa. 2008) (holding that the statute of limitations for the plaintiff's statutory bad faith claim began to run when the insurer denied the insured coverage by letter); *CRS Auto. Parts, Inc. v. Nat'l Grange Mut. Ins. Co.*, 645 F. Supp. 2d 354, 365-66 (E.D. Pa. 2009) (holding that the statute of limitations for the plaintiff's bad faith claims, under either theory of statutory bad faith or on

common law contract, began to run on the date of the defendant's denial letter, which unequivocally gave notice of its denial of coverage).

## B. Scott's Breach of Contract Claim.

Scott's complaint also sets forth a breach of contract claim at Count I.  In order to establish such a claim, Pennsylvania law requires: "(1) the existence of a contract, including its essential terms, (2) [defendant's] breach of a duty imposed by the contract[,] and (3) resultant damages."  *See Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003) (quoting *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)).

Here, there is no genuine dispute of material fact as to the first element: "existence of a contract."  The evidence demonstrates that one did in fact exist, namely, the Policy.  *See doc. 19* at ¶ 5; *doc. 22* at ¶ 5; *doc. 17-2* at 5 (demonstrating that on the date of the subject motor vehicle accident, April 8, 2009, the Policy that Standard issued to Scott was in effect).  There is also no genuine dispute of material fact as to the third element: "resultant damages."  Again, the evidence demonstrates that Scott was in fact damaged by Standards' failure to pay his first-party medical benefits.   *See doc. 37* (exhibiting various medical expenses incurred by Scott).  Thus, it is the third element that speaks to the

core of the parties' present dispute: whether Standard breached a duty imposed by the Policy when it failed to pay Scott's first-party medical benefits.[6]

Scott contends that, pursuant to the terms of the Policy, Standard was obligated to pay him first-party medical benefits and that Standard's refusal to pay those benefits constituted a breach of the Policy.   Standard does not refute Scott's contention that it discontinued paying benefits, but instead argues that such payments were conditioned on Scott's submission to a physical IME.  In support, Standard points to the Policy Provision that requires Scott to submit to an IME as often as Standard reasonably requires (*see doc. 17-2* at 24) and asserts that Scott's refusal to submit to not one, but two, previously scheduled IMEs authorized Standard to stop paying Scott's first-party medical benefits.  Although Scott makes no argument that the Provision is ambiguous, he does argue that it is in conflict with and rendered unenforceable by § 1796 of the MVFRL, which requires an insurer to petition the state court with a showing of "good cause" in order to compel the insured to submit to an IME.[7]

---

[6] This is further reflected in the parties briefing in both support of and opposition to the pending cross-motions for summary judgment, where they only robustly discuss the second element of Scott's breach of contract claim.

[7] In support, Standard cites to *Fleming v. CNA Ins. Co.*, 597 A.2d 1206 (Pa. Super. Ct. 1991) ("*Fleming*") and *Williams v. Allstate Ins. Co.*, 595 F. Supp. 2d 532 (E.D. Pa. 2009) ("*Williams*") which are discussed more fully herein.

Section 1796 of the MVFRL[8] reads, in pertinent part, as follows:

> Whenever the mental or physical condition of a person is material to any claim for medical, income loss or catastrophic loss benefits, a court of competent jurisdiction or the administrator of the Catastrophic Loss Trust Fund for catastrophic loss claims may order the person to submit to a mental or physical examination by a physician. The order may only be made upon motion for good cause shown. The order shall give the person to be examined adequate notice of the time and date of the examination and shall state the manner, conditions and scope of the examination and the physician by whom it is to be performed. If a person fails to comply with an order to be examined, the court or the administrator may order that the person be denied benefits until compliance.

75 PA. CONS. STAT. ANN. § 1796.[9]

Because Standard failed to seek a court order to compel Scott's attendance at the IME, Scott contends that Standard's non-payment of benefits was a

---

[8] For a discussion on the Uniform Motor Vehicle Reparations Act (the Uniform Act from which Pennsylvania's MVFRL was borne), *see* IRVIN E. SCHERMER & WILLIAM J. SCHERMER, AUTOMOBILE LIABILITY INSURANCE § 46:1 (4th ed. May 2016 Update). We will briefly note, however, that "Pennsylvania replaced its No-Fault Motor Vehicle Insurance Act, effective October 1, 1984, with [the MVFRL,] which required the inclusion of no-fault, uninsured motorist, and underinsured motorist coverages in liability policies[.]" *Id.*

[9] The language of § 1796 of the MVFRL was not altered when the law was amended in 1990 by Act 6 (1990, Feb.7, P.L. 11, No. 6, §11).

circumvention of § 1796 of the MVFRL, and thus, a violation of public policy.[10]
We agree.

### 1. The Policy Provision Impermissibly Conflicts with § 1796 of Pennsylvania's MVFRL.

The Pennsylvania Supreme Court has yet to address the specific issue before us in this matter.  Thus, we are left to resolve the issue in accordance with how we predict the state's highest court would interpret § 1796 of the MVFRL, given the context of this case and the insurance policy language involved.  *See In Re Makowka*, 754 F.3d 143, 148 (3d Cir. 2014).  In reaching our resolution, while we are required to give "due deference" to the decisions of the intermediate state courts, and may not ignore such decisions, "we are free to reach a contrary result if, by analyzing other persuasive data, we predict that the State Supreme Court would hold otherwise . . . . Such persuasive data may include . . . what the Pennsylvania Supreme Court has said in related areas and the decisional law of the Pennsylvania intermediate courts." *Id.* (cited case, quoted case, and internal quotation marks omitted)).  "Our precedent, therefore, is clear that a federal court interpreting state law may discount state appellate decisions it finds flawed, if it predicts the [S]tate [S]upreme [C]ourt would reach a contrary result." *Id.*

---

[10] Scott, however, cites to *Erie Ins. Exch. v. Dzadony*, 39 Pa. D. & C.3d 33 (Pa. Com. Pl. 1986) ("*Erie*") and *Nationwide Ins. Co. v. Hoch*, 36 Pa. D. & C.4th 256 (Pa. Com. Pl. 1997) ("*Hoch*"), which are also discussed more fully herein.

In interpreting § 1796, we are further guided by the Pennsylvania rules of statutory construction. "These rules provide that where a statue is clear on its face and unambiguous, it should be interpreted by its plain meaning." *Transguard Ins. Co. of Am., Inc. v. Hinchey*, 464 F. Supp. 2d 425, 433 (M.D. Pa. 2006) (citing 1 PA. CONS. STAT. ANN. § 1921(b)).

Applying these guiding principles here, we predict that the Pennsylvania Supreme Court would find that, absent voluntary compliance on the part of the insured, insurers, like Standard, are not free to disregard the statutory language in § 1796, which sets forth the standard by which an insured may be forced to undergo an IME. We read § 1796 to plainly require the insurer to petition the state court and obtain an order for an IME of its insured based upon a showing of "good cause." 75 PA. CONS. STAT. ANN. § 1796. The statutory language in § 1796 also requires that the courts, not the insurer or the policy's language, determine the precise contours of such IMEs, including: (a) providing the insured with notice of the date and time of the IME, (b) setting the scope and conditions of the IME, and (c) prescribing the physician by whom the IME is to be performed. *Id.*

Section 1796 simply does not permit what happened here, specifically Standard's unilateral termination of Scott's benefits upon the refusal to submit to an IME. We firmly understand "the heavy burden required to declare an unambiguous provision of an insurance [policy] void as against public policy[,]"

19

and while we are likewise wary to hold as much, we are, nevertheless, "obliged to find contractual language to be contrary to public policy when it violates statutory language[.]" *Generette v. Donegal Mut. Ins. Co.*, 957 A.2d 1180, 1190-91 (Pa. 2008); *see id.* at 1191 ("[S]tipulations in a contract of insurance in conflict with, or repugnant to, statutory provisions which are applicable to, and consequently form a part of, the contract, must yield to the statute, and are invalid, since contracts cannot change existing statutory laws." (quoting *Prudential Prop. & Cas. Ins. Co. v. Colbert*, 813 A.2d 747, 751 (Pa. 2002))).   Any other interpretation of the statutorily mandated role of the court in making a good cause determination upon evidence presented to it and in prescribing the parameters regarding time and scope of the physical exam would render § 1796 meaningless, an action we decline to undertake.   We, therefore, predict that the Supreme Court of Pennsylvania would not enforce such an overreaching policy provision, which requires an insured to submit to IMEs by physicians selected by the insurer when and as often as the insurer may reasonably require, because such a provision is in clear derogation of the plain language set forth in § 1796 of the MVFRL.   *See generally Horne v. Sentry Ins. Co.*, 588 A.2d 546, 549 (Pa. Super. Ct. 1991) ("We have no doubt that the insurer here, as in any case, would prefer an independent medical examination in order to evaluate the claim. [Section 1796 of the MVFRL], however, does not allow for such examinations on demand.").

20

Predicting otherwise would, in effect, be a renunciation of the legislature's role in enacting § 1796 of the MVFRL.  Through § 1796, the legislature balanced the interests of (1) the insurer, "in obtaining more complete information in support of a claim through a physical examination by a physician selected by the insurance company," with the interests of (2) the insured, "in having claims paid without being subjected to the inconvenience and invasion of privacy that such examination imposes, by providing for an [IME] pursuant to a court order obtained by the insurance company based upon good cause shown."  *Erie*, 39 Pa. D. & C.3d at 37; *see also Williams*, 595 F. Supp. 2d at 542-43 ("The specific purpose of section 1796 is two-fold. On one hand, it prevent[s] harassment, untoward intrusion and unwarranted examination . . . . On the other hand, it was designed to ensure that the insured could not ignore reasonable limitations on treatment by continuing in treatment without validation or justification.") (quoted case and quotation marks omitted). The Policy provision, however, impermissibly nets tension with this balancing act because it does not take into account the interests of both the insurer and the insured; it only takes into account the interests of the insurer.  Indeed, it functions not as a reasonable challenge to the validity of the insured's claim by seeking an order for good cause shown, *but* as a limitation on the insured's coverage by requiring the insured to *either* submit to the unilaterally compelled IME or be denied coverage.  Had the legislature envisioned such

21

unilateral limitations on coverage, it would not have enacted the order requirement of § 1796, which imposes a showing of good cause upon the insured.

Predicting otherwise would also undermine the general purpose underlying the MVFRL, and its amendments, which is to reduce costs. *See State Auto. Prop. & Cas. Ins. Co. v. Pro Design, P.C.*, 566 F.3d 86, 93 (3d Cir. 2009) ("[T]he primary purpose of the MVFRL, and especially the 1990 amendments . . . , was to control the cost of insurance such that a higher percentage of drivers would be able to afford insurance." (quoting *Everhart v. PMA Ins. Grp.*, 938 A.2d 301, 306 (Pa. 2007))). We cannot ignore the fact that the Policy Provision unfairly shifts not only the cost, but also the burden of challenging the reasonableness of an IME from (a) the corporate insurer, who need only file a petition in state court, to (b) the insured, who is required to initiate full-blown litigation and, as in the case here, hire the legal services of an attorney to do so.

### 2. The Case Law Presented by Standard is Either Distinguishable or Unpersuasive.

Although Standard has offered both Pennsylvania and federal jurisprudence in support of its position that the Policy Provision is indeed valid and enforceable, we find that jurisprudence to either be distinguishable or unpersuasive. In particular, Standard points to *Fleming*, 597 A.2d 1206, where the Pennsylvania Superior Court affirmed the trial court's decision to grant the insurer's motion to

compel the insured's submission to an IME.  We decline, however, to be persuaded that *Fleming* is applicable to the case or arguments presented here.  Although the *Fleming* court compelled an insured to submit to an IME, not on the basis of "good cause" shown, but on the basis that a provision[11] in the policy required it, the *Fleming* court expressly noted that the insureds "did not challenge [the] provision as being void as against public policy or void as unconscionable in . . . the lower court or on appeal."  *Id.* at 1208.  But, in this case, we are presented with that *very* challenge: whether the Policy Provision violates the statutory language set forth in § 1796 of the MVFRL such that the Provision is void as against public policy.  Thus, we decline to follow *Fleming's* holding on the basis that it is distinguishable from this case.

Additionally, Standard relies on *Williams*, 595 F. Supp. 2d 532, where the United States District Court for the Eastern District of Pennsylvania held that a policy provision, which required the insured to submit to IMEs as often as the insurer reasonably required, was enforceable and not negated by the "good cause" standard set forth in § 1796 of the MVFRL. The *Williams* court, in recognizing that the Supreme Court of Pennsylvania has not yet spoken on the breadth of § 1796

---

[11] Specifically, the provision stated, "[t]he injured person shall . . . *[s]ubmit to physical examination by a physician of our choice . . . .*"  *Id.* at 1207 (emphasis in original).

and "whether it forecloses conflicting policy provisions," took the position that the Pennsylvania Superior Court has, nevertheless, "discussed the interplay between [§] 1796" and a policy provision that permits the compelling of IMEs without a showing of good cause. *Id.* at 538 (citing *Fleming*, 597 A.2d 1206). Based largely on the Superior Court's holding in *Fleming*, the *Williams* court held that such policy provisions are not violative of § 1796 of the MVFRL. We, however, expressly disagree with the *Williams* court for a number of reasons.

Most notably, *Fleming* is not persuasive because it is distinguishable from the case and arguments presented here.[12] Instead, we find *Erie* and *Hoch*, cases rejected by the *Williams* court, to align more closely with the scenario before us. In *Erie*, the Honorable R. Stanton Wettick, Jr., in declining to enforce a policy provision that required the insured to submit to IMEs by company-selected physicians "as often as [the insurer] reasonably require[d]," remarked that the provision conflicted with the legislative scheme set forth in § 1796 of the MVFRL. *Erie*, 39 Pa. D. & C.3d at 36-37. And, as such, Judge Wettick turned to the good cause requirement of § 1796 to determine whether the insurer's petition contained allegations that the information supplied by the insureds in support of their claims

---

[12] Although the *Williams* court also relied on Pennsylvania trial court opinions and treatises, those opinions and treatises merely cite or explain the holding in *Fleming*.

was inadequate.   *Id.* at 34-35.  He determined that the insurer's petition contained no such allegations and denied it.  *Id.* at 35.

Almost eleven years later in *Hoch*, Judge Wettick reaffirmed the principles he set forth in *Erie*.  In doing so, he expressly acknowledged *Fleming*, but ultimately considered it unpersuasive because the *Fleming* court never reached the issues raised in *Erie*.  *Hoch*, 36 Pa. D. & C.4th at 264.  In support, Judge Wettick cited the portion of *Fleming*, which stated that that the insureds "[had] not challeng[ed] [the] policy provision as being void as against public policy or void as unconscionable  . . . in the lower court or on appeal."  *Id.* at 263 (quoting *Fleming*, 597 A.2d at 1208).  Thus, Judge Wettick, finding no Pennsylvania appellate case law to be inconsistent with his prior opinion in *Erie*, denied the insurer's petition on the basis of *Erie*.  *Id.* at 264.  Accordingly, unlike the *Williams* court, we find Judge Wettick's discussions in both *Erie* and *Hoch* to be persuasive to the case and arguments presented here.

Moreover, while we generally agree with the *Williams* court's recitation of Pennsylvania jurisprudence, we disagree with its application. Surely, while "courts must give plain meaning to a clear and unambiguous contract provision[,]" courts cannot give plain meaning to such a provision where doing so "would be contrary to a clearly expressed public policy."   *Colbert*, 813 A.2d at 750 (cited case omitted).  Giving plain meaning to policy provisions, like that in the instant Policy,

would be violative of § 1796 of the MVFRL, especially when considering that Pennsylvania's highest court has repeatedly stated that provisions of the MVFRL prevail over conflicting policy language.  *See Allwein v. Donegal Mut. Ins. Co.*, 671 A.2d 744, 752 (1996) (explaining in the context of the MVFRL that "stipulations in a contract of insurance in conflict with, or repugnant to, statutory provisions which are applicable to, and consequently form a part of, the contract, must yield to the statute, and are invalid, since contracts cannot change existing statutory laws." (quoting GEORGE J. COUCH, COUCH ON INSURANCE 2d (Rev. ed) § 13.7 at 827 (1984))); *Colbert*, 813 A.2d at 750 (same); *Generette*, 957 A.2d at 1191 (same).

Furthermore, to the extent that the *Williams* court relied on other states "acting within the framework of their own no-fault insurance statutes" to enforce policy provisions requiring an insured's submission to an IME, we find its reliance misplaced.  Some of the states cited by the *Williams* court do not have a provision akin to that of § 1796 in their statute and do not require, therefore, the insurer to obtain a court order upon a showing of good cause.  *See, e.g.*, *Williams*, 595 F. Supp. 2d at 544 n.9 (citing *Jensen v. Am. Fam. Mut. Ins. Co.*, 683 P.2d 1212, 1213 (Colo. App. 1984) (lacking the order requirement, necessitating good cause); *Falagian v. Leader Nat. Ins. Co.*, 167 Ga.App 800, 307 S.E.2d 698, 700 (1983) (same); *Huntt v. State Farm Mut. Auto. Ins. Co.*, 72 Md.App. 189, 527 A.2d 1333,

26

1337 (1987) (same); *Williamson v. State Farm Ins. Co.*, Civ. A. No. 20182, 2004 WL 1178351, at *4–5 (Ohio Ct.App. May 28, 2004) (briefly addressing Ohio's Rule of Civil Procedure 35, which sets forth a good cause standard, but not addressing a separate order requirement or good cause standard in Ohio's motor vehicle insurance statute)). Other states cited by the *Williams* court, namely, Florida, New Jersey, and Kansas, actually have language in their insurance statutes that authorize insurers to include "reasonable provision[s]" in their policies for the mental and/or physical IMEs of those claiming personal injury protection benefits. *See, e.g.*, *Williams*, 595 F. Supp. 2d at 544 n.9 (citing FLA. STAT. 627.736(7) (2001); KAN. STAT. ANN. § 40–3115(a) (1986); N.J. STAT. ANN. § 39:6A–13(d) (1973)). And, in fact, at least one of the states cited by the *Williams* court, namely Massachusetts, has a statute that actually mandates the insured's submission to physical IMEs when that insured's condition is material to a claim for benefits. *See, e.g*, *Williams*, 595 F. Supp. 2d at 544 n.9 (citing *Bailey v. Metro. Prop. & Cas. Ins. Co*., Civ. A. No. 01307, 2002 WL 1555100, at *3 (Mass. Super. Apr. 29, 2002)); *see also* Massachusetts General Laws c.90 § 34M ("The injured person *shall* submit to physical examinations by physicians selected by the insurer as often as may be reasonably required and shall do all things necessary to enable the insurer to obtain medical reports and other needed information to assist in determining the amounts due.") (emphasis added).   In contrast, the General

Assembly of Pennsylvania has not seen fit to amend § 1796 so as to align its language more closely with that of the statutory language that has been enacted across the country—including the statutory language of Florida, New Jersey, and Kansas, which permits insurers to include reasonable provisions in their policies requiring insureds to submit to IMEs.[13]

Thus, for all of these reasons, we are not persuaded by the case law Standard has presented.  Although we firmly understand that the decisions of Pennsylvania's Superior Court must be given "due deference" when the Pennsylvania Supreme Court has not yet spoken on the issue (*In re Makowka*, 754 F.3d at 148 (cited case omitted)), we find that the Superior Court's decision in *Fleming* is distinguishable from the case and arguments presented here.  We further find that the *Williams* decision is not persuasive, and therefore, we respectfully depart from our sister court's interpretation. And, in doing so, we align ourselves with Judge Wettick's thoughtful disquisitions in both *Erie* and *Hoch*.

---

[13] *See* fn.9 on page 17 of this Memorandum, which observes that the language of § 1796 was not altered by the 1990 amendments.

### 3. Other Considerations Support Our Holding that the Policy's Terms Impermissibly Conflict with § 1796 of the MVFRL.

Finally, in acknowledging our task at hand—that we are predicting how the Pennsylvania Supreme Court would decide this case—we look to sister states and leading treatises for further guidance.  We find that our holding is consistent with the Kentucky case of *Miller v. United States Fid. & Guar. Co.*, 909 S.W.2d 339, 341 (Ky. Ct. App. 1995), a case that analyzes statutory language similar to that of Pennsylvania's MVFRL, and that is legally and factually similar to the one before us.  In *Miller*, the Court of Appeals of Kentucky determined that the insurer's policy provision conflicted with Kentucky's Motor Vehicle Reparations Act (the "MVRA").[14]  In agreeing with the insured, the Court of Appeals opined as follows:

> Were we to conclude that [the insurer] was nevertheless entitled to the independent medical examination by virtue of its policy provision, we would, in effect, impermissibly delegate (indeed, abdicate) to [the insurer] the legislature's role in enacting protective legislation. In enacting the MVRA, the legislature clearly struck a balance, taking into account the needs and

---

[14] In particular, KY. REV. STAT. ANN. § 304.39-270  reads as follows:

> (1) If the mental or physical condition of a person is material to a claim for past or future basic or added reparation benefits, the reparation obligor may petition the circuit court for an order directing the person to submit to a mental or physical examination by a physician. Upon notice to the person to be examined and all persons having an interest, the court may make the order for good cause shown. The order shall specify the time, place, manner, conditions, scope of the examination, and the physician by whom it is to be made.

expectations of both the insured and the obligor. *See*, KRS 304.39–010. As the Kentucky Supreme Court has noted, "[t]he primary purpose of the MVRA is to benefit motor vehicle accident victims by reforming, and in some areas broadening, their ability to make and collect claims." *Crenshaw v. Weinberg, Ky.*, 805 S.W.2d 129 (1991). The statute clearly sets forth the standard by which an insured can be forced to undergo independent medical examination and creates a statutory presumption of reasonableness of medical bills as submitted. Public policy underlying that statute dictates that [the insurer] may not enforce an overreaching policy provision requiring an independent medical examination "when and as often as the company may reasonably require" in clear derogation of the statutory language.

*Id.* at 343.   In response to the insurer's attempt to offer case law from other jurisdictions, including Pennsylvania, to support its position that the policy provision was indeed valid, the *Miller* court specifically mentioned, and quickly dispatched, *Fleming* as follows:

There the appellate court affirmed a trial court order compelling a claimant to submit to an independent medical examination not on the basis of "good cause" having been shown, but instead upon the basis that the insurer's policy provision required it. We do not consider the holding of *Fleming* persuasive. In concluding its analysis of whether the obligor's policy provision could be enforced, the appellate court specifically noted that the claimants "did not challenge this policy provision as being void as against public policy or void as unconscionable . . . ." *Id.* at 1208. In this case, we have been confronted with that very issue and have decided, in light of the purposes of our MVRA, that the policy provision simply may not be enforced as being clearly violative of the public policy underlying our statute.

*Id.*

Additionally, our holding is consistent with a comprehensive treatise discussing physical and mental IMEs in the context of the Uniform Act.[15] As articulated by IRVIN E. SCHERMER & WILLIAM J. SCHERMER, AUTOMOBILE LIABILITY INSURANCE § 61:1 (4th ed. May 2016 Update), most states' acts, arising from the Uniform Act, "do not initially require the insurer to apply for an order requiring the insured to submit to examination by an insurer designated physician." *Id.* And, in fact, the "[t]he District of Columbia, Kansas, Massachusetts, Michigan, and North Dakota acts provide that when an insured's condition is material to a claim for benefits, he *shall* submit to a physical or mental examination." *Id.* (emphasis in original). This is a material distinction from Kentucky and Pennsylvania's acts (respectively, the MVRA and the MVFRL), which *do* require the insurer to petition the court for an order compelling an IME. *Id.* Moreover, in reviewing both of these acts, the authors opined that "[a] showing of good cause is necessary, and the physician is selected by the court." *Id.*

Thus, we find that these other considerations, including analogous case law from our sister state of Kentucky and Irvin and William Schermer's comprehensive

---

[15] *See* fn.8 on page 17 of this Report and Recommendation, addressing the Uniform Act.

treatise, are consistent with our holding that the Policy's language impermissibly conflicts with § 1796 of the MVFRL.[16]

### 4. Conclusion as to § 1796 of the MVFRL and Standard's Corresponding Breach of the Policy.

To conclude, we are presented with the issue of whether contractual language in an insurance policy, which requires an insured to submit to physical IMEs by physicians selected by the insurer when and as often as the insurer may reasonably require, is enforceable in light of the statutory language set forth in § 1796 of the MVFRL.  Based on the policy of cost containment that motivated the enactment of the MVFRL, the plain language set forth in § 1796 of that statute, and the legislature's balancing of both the insured's and the insurer's interests in requiring the insurer to seek a court order to compel the insured's attendance at an IME, we predict that the Supreme Court of Pennsylvania would find that the Policy Provision impermissibly conflicts with § 1796 of the MVFRL such that the Provision is rendered void as against public policy.

---

[16] We briefly note that our holding is also consistent with the manner in which insurers in Pennsylvania are proceeding in state court for an order compelling the insured to submit to an IME, even though a provision within the insurance policy requires it.  *See, e.g.*, *Selcovitz v. Erie Ins. Exch.*, 2015 WL 9583711, *2 (Pa. Com. Pl. Nov. 24, 2015) (demonstrating how an insurer petitioned the state court for an order compelling its insured's submission to an IME, even though there was language in the insurance policy that required the insured's submission to such examinations).

32

Accordingly, to the extent that Standard relies on this Provision to argue that it did not breach a duty imposed by the Policy, we find its reliance improper. Thus, we accept Scott's argument that Standard breached its duty to pay him first-party Medical benefits as required by the Policy.  Because Scott has established (1) the existence of a contract—the Policy; (2) a breach of a duty imposed by that contract—Standard failed to pay his first-party medical benefits pursuant to the Policy; and (3) damages—including Scott's extensive medical bills—we find that Scott is entitled to judgment as a matter of law on his breach of contract claim.

## VI. Conclusion.

For all of the foregoing reasons, both Scott's motion (*doc. 26*) and Standard's motion (*doc. 17*) for summary judgment will be granted in part and denied in part.  Scott's motion will be granted as to his breach of contract claim, but denied as to his statutory bad faith claim.  Accordingly, Standard's motion will be granted as to Scott's statutory bad faith claim, but will be denied as to his breach of contract claim.  An implementing order follows.

*__S/Susan E. Schwab__*
Susan E. Schwab
United States Magistrate Judge